Filed 9/17/20  P. v. Smith CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MIRRA NOVAK SMITH,<br><br>    Defendant and Appellant. | D075784<br><br><br>(Super. Ct. No. SCN350521) |

APPEAL from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge. Affirmed.

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel B. Rogers and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

A jury found Mirra Novak Smith guilty of one count of animal cruelty (Pen. Code, § 597)[1] (count 1)[2] and five counts of animal abuse or neglect (§ 597, subd. (b)) (counts 2–6). After the trial court granted Smith a new trial on the animal abuse or neglect counts (counts 2–6), the prosecutor dismissed those charges.[3] At sentencing, the trial court reduced the remaining felony animal cruelty conviction to a misdemeanor pursuant to section 17,

---

[1] All subsequent statutory references are to the Penal Code, unless otherwise specified.

[2] Count 1 pertained to a horse that Smith owned, named LP Daredevil (LP).

[3] Smith filed a motion for new trial on counts 2–6 pursuant to the "statutory preemption doctrine," which precludes the People from charging a defendant under a " 'more general law,' " when a more " 'specific provision,' " applies to the conduct at issue. The trial court granted a new trial as to these counts. This appeal pertains solely to Smith's conviction on count 1, the animal cruelty charge pertaining to LP.

subdivision (b),[4] and placed Smith on three years of summary probation, subject to various conditions.

On appeal, Smith claims that the "corpus delicti of the charged crime . . . was not established independent of [her] extrajudicial statements." (Capitalization omitted.)  Smith's argument is premised on the corpus delicti rule, which " 'requires corroboration of the defendant's extrajudicial utterances insofar as they indicate a crime was committed . . . .' " (*People v. Krebs* (2019) 8 Cal.5th 265, 317 (*Krebs*).)  We conclude that the People sufficiently corroborated Smith's extrajudicial statements and thus satisfied the corpus delicti rule.

---

[4]    Notwithstanding the trial court's reduction of the animal cruelty conviction to a misdemeanor, we have jurisdiction over Smith's appeal.  (See Cal. Rules of Court, rule 8.304, subd. (a)(2) [outlining rules governing the filing of a notice of appeal in a "felony case," and defining "felony case," to include "[a]n offense filed as a felony but punishable as either a felony or a misdemeanor, and the offense is thereafter deemed a misdemeanor under Penal Code section 17(b)" (*id.* at (a)(2)(C))].)

II.

FACTUAL BACKGROUND[5]

On August 29, 2013, the Department of Animal Services (the Department) received a report that Smith's horses were underweight and lacked water. Two days later, Department officers met with Smith at her property. Smith showed the officers where she kept approximately 50 horses. Some of the horses appeared to be very underweight. According to one of the officers, a horse named LP was so "severely underweight" that its bones were abnormally visible. The officer determined that LP needed immediate veterinary care. A second horse required immediate veterinary care related to its hooves.

On September 15, an officer returned to Smith's property. The officer discovered that Smith had not obtained veterinary care for LP or for the other horse in need of care. The officer provided Smith with notice that, if she failed to obtain treatment for the horses, the Department might seize the two horses. Shortly thereafter, Smith obtained veterinary care for LP and

---

[5]    In part III.B, *post*, we summarize the evidence presented at trial, *apart from* Smith's statements, that satisfy the corpus delicti rule. Because, for reasons that we explain in part III.B, *post*, the corpus delicti rule was satisfied, Smith's " 'extrajudicial statements . . . [could] be considered for their full value to strengthen the case on all issues.' " (*People v. Dalton* (2019) 7 Cal.5th 166, 218 (*Dalton*).) Thus, in our factual background, we summarize the evidence presented at trial, *including* Smith's statements.

the other horse. During an inspection in November 2013, an officer discussed with Smith various ways of improving the care of her horses and told her that the Department would be checking up on her in four or five months.

In April and May of 2014, the Department repeatedly attempted to contact Smith, but she failed to respond to the inquiries. On June 18, 2014, an officer surveilled Smith's property from a helicopter and determined that Smith still had animals, which the officer believed to be horses, on the property.

On June 23, 2014, Department Officer Julia Bixby went to Smith's property and observed LP. Bixby issued another pre-impoundment notice to Smith that directed her to obtain veterinary care for LP or risk impoundment. Officer Bixby testified that, after issuing the impoundment notice, she and Smith had the following conversation:

> "When I told Ms. Smith she needed to provide veterinarian care, she said she would probably end up just shooting the horse which is legal. You're allowed . . . to euthanize your horse or your animal in a humane manner by shooting. You must shoot to kill. You cannot shoot to maim. And you cannot let it suffer. So[,] there are prescribed ways to shoot livestock, and we did discuss that. We discussed what was inhumane. Ms. Smith told me she's a really good shot, it would be a very humane euthanasia for him."

5

On or around June 30, 2014, Smith exchanged text messages with a friend named K.B. concerning euthanizing LP.[6]  In one of the text messages, Smith asked K.B., "What happens if I inject [C]lorox or gasoline, is that terrible?"  K.B. responded, "Gasoline will kill him."

Shortly thereafter, Smith texted K.B., "What would u think 50cc?"  K.B. responded, "It takes 100[ ]ml of euth. [s]olution."  Smith texted, "So 100 of gasoline?"  K.B. responded, "Get anything in the carotid . . . & he will drop like light[ ]ning."

A few minutes later, Smith texted K.B., "So I should just knock him out, put in an IV . . [.] And inject gasoline til he dies?"  K.B. responded, "Look . . . I cant do this any more . . . calla vet in the morning."

On June 30, Smith spoke to Officer Bixby on the phone.  Smith informed Officer Bixby that she had "euthanized LP."  Officer Bixby responded that she would discontinue proceedings concerning LP as soon as she received photographs of LP's deceased body.[7]  Smith sent Bixby photographs of LP lying on the ground, apparently dead.

---

[6]     We have reproduced the text messages as they appear in the record. The grammatical errors are in the original messages.

[7]     Officer Bixby testified, "I told her as soon as I receive[d] the photographs of LP dead that I would hand off the call . . . .  Then I received photographs of LP that presumably showed him dead."

6

On June 30, Smith texted K.B., "So I sent you this pic. Does he look dead to you? He was barely breathing. I could have sworn he was on his way out."

K.B. responded, "He looked dead but they will find him when they come out. What did you use because he may still go into organ failure this week."

Two minutes later, Smith texted K.B. back, "Gasoline after I knocked him out."

On July 3, Smith texted K.B., "LP died during the night."

Approximately, two months later, on August 23, 2014, the Department executed a search warrant on Smith's property during which the Department seized 31 horses. Officers did not recover LP or his body. Several of the horses were extremely underweight and had other medical conditions consistent with neglect.

A veterinarian testified that he had never heard of anyone injecting a horse with gasoline as a way of euthanizing a horse. The veterinarian testified that it was "difficult for [him] to envision it," and stated, "I can only imagine [t]hat the horse would suffer essentially." The veterinarian explained that injecting a horse with gasoline would cause the horse to suffer "death by toxic overload." When asked whether it "would . . . be a quick death," the veterinarian responded, "I do not believe so."

DISCUSSION

*There is sufficient evidence in the record to satisfy the corpus delicti rule*

Smith claims that the People failed to establish the corpus delicti of the animal cruelty charge. Specifically, Smith argues that, apart from her extrajudicial statements, there was "no physical evidence as to how LP died," nor any physical evidence that "LP in any way suffered." Thus, Smith contends, there was not sufficient independent evidence, apart from her statements, demonstrating that she killed LP with malice, as required to prove the animal cruelty charge.

A. *Governing law and standard of review*

    1. *The corpus delicti rule*

" 'To convict an accused of a criminal offense, the prosecution must prove that . . . a crime actually occurred.' [Citation.] '[T]he corpus delicti or body of the crime . . . cannot be proved by *exclusive* reliance on the defendant's extrajudicial statements.' [Citation.]" (*Dalton*, *supra*, 7 Cal.5th at p. 218.) Thus, as noted in part I, *ante*, the corpus delicti rule requires corroboration of the defendant's out-of-court statements for purposes of proving the commission of a crime. (*Krebs*, *supra*, 8 Cal.5th at p. 317.) In *Krebs*, the Supreme Court described the quantum of proof sufficient to satisfy the rule as follows:

" 'The amount of independent proof of a crime required [to satisfy the corpus delicti rule] is quite small.' [Citation.] The prosecution need not adduce 'independent evidence of every physical act constituting an element of an offense.' [Citation.] Instead, it need only make 'some indication that the charged crime actually happened,' so as to ensure 'that the accused is not admitting to a crime that never occurred.' " (*Ibid.*)

Similarly, in *Dalton*, the Supreme Court emphasized that only

" 'slight' " (*Dalton*, *supra*, 7 Cal.5th at p. 218) independent evidence need be

present to satisfy the corpus delicti rule:

> " 'The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible. [Citations.] There is no requirement of independent evidence "of every physical act constituting an element of an offense," so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency. [Citation.] In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues.' " (*Ibid.*)[8]

---

[8]    The trial court instructed the jury concerning the corpus delicti rule pursuant to CALCRIM No. 359 as follows:

> "The defendant may not be convicted of any crime based on their out-of-court statements alone. You may only rely on the out-of-court statements to convict them if you conclude that other evidence shows that the charged crime was committed. That other evidence may be slight and need be only enough to support a reasonable inference that the crime was committed.
>
> "The identity of the person who committed the crime may be proved by the defendant's statement alone. You may not

9

"[W]e independently review whether the prosecutor put forth the requisite independent proof to establish the corpus delicti." (*In re D.A.* (2018) 24 Cal.App.5th 768, 771.)

2. *Relevant substantive law*

Section 597, subdivision (a) provides in relevant part:

> "[E]very person who maliciously and intentionally maims, mutilates, tortures, or wounds a living animal, or maliciously and intentionally kills an animal, is guilty of a crime . . . ."

The trial court instructed the jury on the elements of the animal cruelty charge pursuant to a modified version of CALCRIM No. 2953, as follows:

> "The defendant i[s] charged in count one with cruelty to animals in violation of . . . section 597[, subdivision] (a). To prove the Defendant is guilty of this crime, the people must prove that[:]
>
> "one, the defendant maimed, mutilated, tortured, wounded or killed a living animal[;] and[ ]
>
> "two, the defendant acted maliciously.
>
> "Torture means every act, failure to act or neglect that causes or permits unnecessary or unjustifiable physical pain or suffering.
>
> "Maiming means disabling or disfiguring an animal permanently, or depriving it of a limb, organ or other part

---

> convict the defendant unless the people have proved their guilt beyond a reasonable doubt."

10

of their body.  Someone acts maliciously when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to disturb, annoy, or injure an animal."[9]

B.  *Application*

There is evidence in the record, independent of Smith's statements, sufficient to satisfy the corpus delicti rule.  We review that evidence below.

To begin with, Smith sent Officer Bixby photographs on June 30, 2014 that appeared to depict LP's deceased body.[10]  Officer Bixby described one of the photographs (Exhibit 80) as follows:

> "Picture 80 shows LP on the ground laying [*sic*] on his side with his head down on the ground, and he's wearing a halter.  Just . . . basically the main part of the picture shows his head in the foreground, head to the shoulders.  On this side of the picture, on the bottom side of the picture, we see part of the pipe corral that he was in."

Officer Bixby testified concerning a second photograph (Exhibit 81) that also depicted LP lying against the pipe coral wall.  Officer Bixby stated that it

---

[9]     Smith does not dispute that CALCRIM No. 2953 properly states the elements of the crime.

[10]     Smith's extrajudicial statements, referred to in part II, *ante*, indicate that LP likely was not dead at the time the June 30 photographs were taken. At 9:06 a.m. on June 30, in response to K.B.'s text, "What did you use[?]," Smith texted K.B., "Gasoline[,] after I knocked him out."  On July 3, Smith texted K.B., "LP died during the night."

11

was unusual for a person to euthanize a horse inside a corral. Officer Bixby explained:

> "Generally[,] when people choose to euthanize their animal, they euthanize them outside of the corral. There's different reasons why you would want that. One is when you euthanize an animal that weighs hundreds of pounds, you don't know which way they're going to fall. So[,] they sway, they can fall side to side. They can fall forward backward. So[,] you do not want to be inside of a corral with them when that happens. You want to be in an open area so you would move them out to where you are not in a corral.
>
> "In addition, just talking about the simple logistics of disposal, you're going to need to get a tractor or some sort of thing in there to pull it out so you can dispose of them. It is going to be extremely tough to pull an animal this size out of a corral to go and bury it somewhere."

Officer Bixby also testified that there were markings on the ground in the photograph that were consistent with LP having "suffered":

> "I can see here that there's a ridgeline of dirt that makes a semicircle where . . . like a little wall of dirt has been made. Oftentimes when an animal goes down on the ground and is struggling to get up, they'll start paddling their feet struggling to get up. We call it digging a grave. So[,] he was basically suffering before he presumably was dead in this photograph. He was struggling to get up. Horses are a prey animal ultimately, and they do not want to be on the ground unable to get up. They want to get up bad so they're not pr[e]y."

Department Lieutenant Mitchell Levy also viewed the photographs of LP lying on the ground. Lieutenant Levy stated that when he looked at the photographs, he could see that "it was a horse down on the ground, it was [a]

12

horse that was probably dead, but there [were] some unusual situations about the horse." Levy explained that although an "acceptable [way] of euthanizing a horse is by gunshot," there "was no blood anywhere" in the photographs, which suggested that LP had not been shot.

Thus, the record contains photographs that Smith sent Officer Bixby on June 30 that suggested that LP appeared to have "suffer[ed]" before dying, that LP was lying on the ground in a location that would not commonly be used to euthanize a horse, and that there were no indications that LP had been euthanized by way of a gunshot.

In addition to the photographic evidence, the statements that K.B. made to Smith just before LP's death also support the conclusion that Smith injected LP with gasoline. K.B. texted Smith on or about June 30, "Gasoline will kill [LP]." Minutes after sending this text, K.B. texted Smith, "Get anything in the carotid . . . & he will drop like light[ ]ning." *K.B.*'s statements to Smith that gasoline would kill LP and that an injection into the carotid artery would cause him to "drop like light[ ]ning," corroborates evidence of *Smith*'s statements that she killed LP by way of a gasoline injection.[11] In

_____

[11] While we agree with Smith that "*appellant's* admissions contained in the text messages," may not be used to satisfy the corpus delicti rule, Smith fails to present any argument pertaining to *K.B.'s* statements in the text messages in the legal argument section of her brief. (Italics added.)

The People also do not specifically address K.B.'s statements in the text messages in the legal argument section of their brief.

addition, the People presented expert testimony that injecting a horse with gasoline would likely cause the horse to suffer.

The People also presented evidence regarding the animal control officers' observations and interactions with Smith pertaining to LP. On June 23, 2014, Officer Bixby observed LP. Officer Bixby determined that LP was in need of immediate veterinary care and directed Smith to obtain such care, or the Department might impound LP. On June 30, Officer Bixby indicated to Smith that Officer Bixby would discontinue proceedings pertaining to LP "as soon as [Officer Bixby] receive[d] photographs of LP [deceased]." In response, Smith sent Officer Bixby the photographs discussed *ante* (Exhibits 80 and 81). The People also presented evidence that LP was not present on Smith's property when officers conducted a search of Smith's residence on August 23, 2014, despite having been there on June 23, when Bixby observed him. In addition, while conducting the August 23 search, officers found several piles of bones, which appeared to belong to several large animals. Thus, the record contains evidence suggesting that Smith killed LP so as to avoid undergoing further proceedings pertaining to LP with the Department.

In addition to evidence pertaining directly to the circumstances of LP's death, the record also contains evidence that Smith had not properly cared for LP prior to his death. On August 31, 2013, an animal control officer observed LP and determined that he was "severely underweight." An officer

14

directed Smith to have a veterinarian examine LP. Smith did not have a veterinarian examine LP promptly, and on September 15, an officer issued a pre-impoundment notice pertaining to LP. Officer Bixby issued a second pre-impoundment notice pertaining to LP in June 2014.

The record also contains extensive evidence pertaining to Smith's neglect of other horses that she owned. For example, the People presented photographic evidence and testimony pertaining to the physical condition of Smith's horses at the time of the officers' August 23 seizure of the horses. Many of the horses were severely underweight and/or had significant other medical conditions that were consistent with lack of proper care. In addition, the record contains evidence that Smith did not maintain adequate food supplies and water for her horses and that Smith ignored the Department's repeated requests to contact the Department during early 2014.

In sum, apart from Smith's statements, the People presented photographs, text messages, and expert testimony supporting a finding that Smith killed LP maliciously by injecting LP with gasoline in a manner that caused LP to suffer before dying, testimonial evidence that Smith had been neglectful of LP and other horses, and evidence from which the jury could conclude that Smith had a motive to kill LP to avoid further Departmental proceedings pertaining to the horse. Given this evidence, we conclude that the record contains, at a minimum, " 'some indication that the charged crime

actually happened.' " (*Krebs*, *supra*, 8 Cal.5th at p. 317.)  Specifically, we conclude that the record contains more than " 'slight' " evidence, independent of Smith's statements, that she maliciously killed LP.  (*Dalton*, *supra*, 7 Cal.5th at p. 218.)

Accordingly, we conclude that there is sufficient evidence in the record to satisfy the corpus delicti rule.

## IV.

## DISPOSITION

The judgment is affirmed.


AARON, J.

WE CONCUR:

IRION, Acting P. J.

GUERRERO, J.